E-FILED
Wednesday, 27 November, 2013  08:48:13 AM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| CARMELLA JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  12-cv-1286 |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

# O R D E R  &  O P I N I O N

This matter is before the Court on Plaintiff's Motion for Summary Judgment and Defendant's Motion for Summary Affirmance.[1] (Docs. 14 & 19). For the reasons stated below, the Motion for Summary Judgment is denied, and the Motion for Summary Affirmance is granted.

### STANDARD OF REVIEW

To be entitled to disability benefits under the Social Security Act, a claimant must prove that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). To determine if the claimant is unable to engage in any substantial gainful activity, the Commissioner of Social Security engages in a factual determination. *See McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). That

---

[1]    Plaintiff filed a Reply in support of her Motion for Summary Judgment. (Doc. 21). Absent specific Court permission, there are no Replies in Social Security cases under this Court's Local Rules 7.1(D)(6) and 8.1. The Court therefore does not consider Plaintiff's Reply.

factual determination is made by using a five-step sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; *see also Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir. 1999).

In the first step, a threshold determination is made to decide whether the claimant is presently involved in a substantially gainful activity. 20 C.F.R. §§ 404.1520(a)(i), 416.920(a)(i). If the claimant is not under such employment, the Commissioner of Social Security proceeds to the next step. At the second step, the Commissioner evaluates the severity and duration of the impairment. 20 C.F.R. §§ 404.1520(a)(iii), 416.920(a)(iii). If the claimant has an impairment that significantly limits her physical or mental ability to do basic work activities, the Commissioner will proceed to the next step. At the third step, the Commissioner compares the claimant's impairments to a list of impairments considered severe enough to preclude any gainful work; and, if the elements of one of the Listings are met or equaled, she declares the claimant eligible for benefits. 20 C.F.R. §§ 404.1520(a)(iv), 416.920(a)(iv); 20 C.F.R. Part 404, Subpart P, Appendix 1.

If the claimant does not qualify under one of the listed impairments, the Commissioner proceeds to the fourth and fifth steps. At the fourth step, the claimant's residual functional capacity ("RFC") is evaluated to determine whether the claimant can pursue her past work. 20 C.F.R. §§ 404.1520(a)(iv), 416.920(a)(iv). If she cannot, then, at step five, the Commissioner evaluates the claimant's ability to perform other work available in the economy. 20 C.F.R. §§ 404.1520(a)(v), 416.920(a)(v).

The claimant has the burden to prove disability through step four of the analysis, *i.e.*, she must demonstrate an impairment that is of sufficient severity to

preclude her from pursuing her past work. *McNeil*, 614 F.2d at 145. However, once the claimant shows an inability to perform her past work, the burden shifts to the Commissioner, at step five, to show the claimant is able to engage in some other type of substantial gainful employment. *Id.*

Once a case reaches a federal district court, the court's review is governed by 42 U.S.C. § 405(g), which provides, in relevant part, "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Maggard*, 167 F.3d at 379 (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In a substantial evidence determination, the Court will review the entire administrative record, but it will "not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). The Court must ensure that the administrative law judge ("ALJ") "build[s] an accurate and logical bridge from the evidence to his conclusion," even though he need not have addressed every piece of evidence. *Id.* at 872.

## BACKGROUND

## I.    Procedural History

Plaintiff filed an application for disability benefits on July 1, 2009, alleging an onset of disability in May 2005, which she later amended to May 30, 2009. (Tr.

43-44, 193-202).[2] Her claim was denied. (Tr. 143-49). Plaintiff requested a hearing, which was held on May 4, 2011. (Tr. 38, 162). Following the ALJ's May 27, 2011 decision denying benefits, Plaintiff filed a request for review by the Appeals Council, which was denied on June 27, 2012. (Tr. 1). Plaintiff then filed the instant action on August 13, 2012 pursuant to 42 U.S.C. § 405(g). (Doc. 1).

## II.    Relevant Medical History[3]

Plaintiff alleges a disability onset date of May 30, 2009, so the period at issue is the time from May 30, 2009 to June 27, 2012. The Court thus primarily considers the medical history from that period, though a few earlier records are relevant for context and because they were cited by the ALJ.

In May 2005, Plaintiff was diagnosed with spina bifida occulta[4] by Dr. Rita Hungate. (Tr. 1219). Plaintiff visited the emergency department in April 2007,

---

[2]    The transcript in this matter is found in the docket at docket entry 14, and is cited in this opinion as "Tr.," using the pagination assigned by the Social Security Administration.

Plaintiff previously filed an application for benefits in 2005, but did not pursue the claim after it was denied by the ALJ.

[3]    As noted above, the Court reviews the entire administrative record, but focuses its discussion and analysis on the issues and evidence raised by the parties. Local Rule 8.1(D) provides that "[t]he plaintiff must cite to the record by page number the factual evidence which supports the plaintiff's position," and the Court does not scour the record for additional evidence that might support a plaintiff's claims. Especially where a plaintiff is, as here, represented by counsel, the failure to cite particular pieces of evidence in the record must constitute a waiver of the plaintiff's reliance on that evidence.

[4]    Dorland's Medical Dictionary defines spina bifida occulta as "spina bifida in which there is a defect of the vertebral arch without protrusion of the spinal cord or meninges." "Spina Bifida Occulta," DORLAND'S MEDICAL DICTIONARY, http://dorlands.com (last visited November 20, 2013). The Spina Bifida Association notes that, though some forms of the condition cause problems, "[spinal bifida occulta] is common; 10 to 20 percent of healthy people have it. Normally it is safe

4

complaining of a sore throat over the last two days. She was discharged a short time later with a prescription for antibiotics. (Tr. 836-37). In September 2007, Plaintiff went to the emergency department after straining her back picking up her grandson. At that time, she was employed and was able to walk without difficulty. She was discharged after receiving an intramuscular injection of a pain reliever. (Tr. 846-49).

In March 2009, Plaintiff saw Dr. Agarwal with hypertension, low back pain, and bilateral knee pain. (Tr. 938). Dr. Agarwal addressed Plaintiff's continued hypertension with medication, with which she was compliant; he also instructed her to lose weight and improve her diet. He noted the earlier x-ray showing spina bifida occulta, and ordered a new x-ray of Plaintiff's lumbar spine; Plaintiff reported losing her balance occasionally. Related to her knee pain, Dr. Agarwal indicated that Plaintiff had "very poor compliance with physical therapy" and refused a steroid injection. (Tr. 938). The lumbar spine x-ray was taken in March 2009, and the radiologist found mild degenerative changes. (Tr. 465). Compared the results to a scan taken in March 2006, he found no change. (Tr. 465). Also in March 2009, Plaintiff had a scan of her knee, which revealed some progress of Plaintiff's arthritis and degenerative-related tearing of her medial meniscus. (Tr. 466-69).

Plaintiff had a spinal x-ray in June 2009, and the radiologist found no disc herniation or spinal stenosis, and some degenerative changes. (Tr. 956-57). In June

and people often find out they have it through an X-ray. Spina Bifida Occulta usually doesn't cause nervous system problems." Spina Bifida Association, "Spina BifidaOcculta,"http://www.spinabifidaassociation.org/site/c.evKRI7OXIoJ8H/b.8277 205 (last visited November 22, 2013). The medical record in this case contains a "Fact Sheet: Spina Bifida Occulta" from the Australian Spina Bifida & Hydrocephalus Association, which contains similar information. (Tr. 1216-18).

2009, Plaintiff reported to Dr. Agarwal for follow-up after a motor vehicle accident a few days prior. (Tr. 936). Dr. Agarwal reported that X-rays at the time of the accident showed some arthritic changes in her lumbar spine, and the radiology report indicated mild scoliosis and sclerosis, with no acute abnormalities. (Tr. 923, 936). The x-ray of Plaintiff's cervical spine was normal. (Tr. 922). Dr. Agarwal concluded that Plaintiff's acute lower back pain was due to the accident, prescribed muscle relaxers, and referred her for physical therapy. He also noted her chronic left knee pain; he planned a referral to another doctor, and offered steroid injections as an alternative, which Plaintiff refused. (Tr. 936). On June 29, 2009, Plaintiff returned to Dr. Agarwal with depression, lower back pain, and bilateral knee pain. (Tr. 935). She felt severely depressed, but was not actively suicidal, though she was sad and overwhelmed with problems. Plaintiff reported to Dr. Agarwal that she could not work and wanted disability benefits and a medical card. Dr. Agarwal continued Plaintiff's medications; Plaintiff refused the recommended injections for her knee pain, and Dr. Agarwal referred her for physical therapy. (Tr. 935).

Plaintiff reported to the emergency room on July 7, 2009, stating that she felt she could commit suicide due to an increase in stress at home, though she did not have a plan for suicide and did not think she would go through with it. (Tr. 670). She was admitted to the psychiatric unit of the hospital. (Tr. 675). On July 8, Plaintiff saw Dr. Karen Kyle, who found that Plaintiff was depressed and prescribed an antidepressant and recommended counseling. (Tr. 663-65, 1059-60). Dr. Kyle noted that Plaintiff had a prescription for a different antidepressant, but that she had not been taking it; she also had been seeing a counselor, but didn't

believe it was helpful because the counselor could not help her with her problems. (Tr. 664, 1060). She also noted that Plaintiff had several stressors in her life, which led to the  breakdown at her doctor's office that precipitated the emergency room visit. (Tr. 663). Dr. Kyle referred Plaintiff to Dr. Erich Acebedo for medical management, who saw her on July 9, 2009. (Tr. 667-68). Other than her injuries from the motor vehicle accident, Plaintiff reported that she had no active medical issues. (Tr. 667). Dr. Acebedo's significant findings were asthma and hyptertension. (Tr. 668).

Plaintiff began physical therapy on July 14, 2009, following the June motor vehicle accident; the physical therapy continued until September 11, 2009. (Tr. 303-49, 1112-62). At the end of the physical therapy, Plaintiff's score on the "Modified Oswestry Low Back Pain Questionnaire" was 56%, which is correlated with "severe disability."[5] (Tr. 312-13, 1123-24). Plaintiff saw Dr. Agarwal in September 2009; he reported that she was stable on her medications, and was scheduled to see a counselor. (Tr. 1035).

Dr. Alan Jacobs, PhD, conducted a psychological evaluation of Plaintiff on September 29, 2009. (Tr. 982-84). He concluded that though she had a history of post-traumatic stress disorder, her symptoms of it were vague, and she exaggerated mildly, having both histrionic and borderline tendencies. Dr. Jacobs did not believe

---

[5]     This is a subjective questionnaire attempting to quantify a patient's level of back pain. The Court was unable to find a reference scale for the "modified" version of the Oswestry questionnaire; the "unmodified" Oswestry questionnaire labels a 56% score as "severe disability," and it appears that the interpretation is the same for the two versions of the questionnaire. *See* Longo, *et al.*, "Rating Scales for Low Back Pain," 94.1 BR.MED.BULL. 81-144 (2010) (available at http://bmb.oxfordjournals.org/content/94/1/81.full).

that Plaintiff was depressive or a suicide risk, and found her long term memory to be essentially good, and that her short-term memory was mildly impaired. He concluded that she would likely test within the upper borderline range of intellectual functioning. (Tr. 984).

On that same day, Dr. James Ausfahl evaluated Plaintiff's physical abilities. (Tr. 1013-17). He reviewed records from Dr. Agarwal, two MRIs and a CT, took Plaintiff's history, and performed a physical examination. (Tr. 1013). Plaintiff self-reported a history of sickle cell trait.[6] He found that Plaintiff needed no assistive devices; had only mild problems with getting on and off the exam table, tandem walking, and squatting; and had severe knee pain when attempting to walk on her toes and heels. (Tr. 1016).

In October 2009, Dr. Lenore Gonzalez, a consultative physician, assessed Plaintiff's physical RFC based on a March 31, 2009 MRI of Plaintiff's left knee, a June 5, 2009 CT scan of Plaintiff's head, a June 16, 2009 MRI of Plaintiff's spine, and a September 29, 2009 physical exam. (Tr. 999-1006). She found that Plaintiff

---

[6]     Dorland's Medical Dictionary defines "sickle cell trait" as "the condition, *usually asymptomatic*, caused by heterozygosity for hemoglobin S." "Sickle Cell Trait," DORLAND'S MEDICAL DICTIONARY, http://dorlands.com (last visited November 20, 2013) (emphasis added). It is related to, but not the same condition as "sickle cell anemia," which Dorland's defines as "a hereditary hemolytic anemia…It is an autosomal recessive disorder in which mutation of the HBB gene (locus: 11p15.5), which encodes the ß-globin chain, results in hemoglobin S, which has decreased solubility in the deoxygenated state and results in abnormal sickle-shaped erythrocytes (sickle cells). Homozygous individuals have 85 to 95 percent sickle cells and have the full-blown syndrome with accelerated hemolysis, increased blood viscosity and vaso-occlusion, arthralgias, acute attacks of abdominal pain, ulcerations of the lower extremities, and periodic attacks of any of the conditions called sickle cell crises. *The heterozygous condition is called sickle cell trait and is usually asymptomatic*." "Anemia," DORLAND'S MEDICAL DICTIONARY, http://dorlands.com (last visited November 20, 2013).

had the ability to occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk about 6 hours in a workday, sit for about 6 hours in a workday, and push or pull the same weights she could lift or carry. She also found that Plaintiff could occasionally climb ramps, and stairs; could never climb ladders, ropes, or scaffolds; and could occasionally balance, stoop, kneel, crouch, and crawl. She found that Plaintiff had no manipulative, visual, or communicative limitations. In consideration of Plaintiff's pain, Dr. Gonzalez found that Plaintiff should avoid concentrated exposure to extreme cold, and determined that she should avoid concentrated exposure to extreme heat, humidity, fumes, odors, dusts, gases, and poor ventilation in order to avoid aggravating her asthma. Dr. Gonzalez also determined that Plaintiff should avoid concentrated exposure to unprotected hazards. (Tr. 999-1003).

Dr. Gonzalez reviewed Plaintiff's allegations and statements regarding her abilities and activities, and determined that her allegations were only partially credible. (Tr. 1004). She noted that there was no statement from a medical source regarding Plaintiff's physical abilities. (Tr. 1005). Summarizing Plaintiff's condition, Dr. Gonzalez noted her elevated blood pressure, but found that there were no signs of significant end-organ involvement as a result. Similarly, she noted that neither Plaintiff's asthma nor her sickle cell trait produced any limitations. She acknowledged Plaintiff's obesity, pain, and limited range of motion, but believed that Plaintiff's allegations concerning her activities of daily living were only partially credible. She concluded that Plaintiff was capable of light unskilled work activity.

Also in October 2009, Dr. Leslie Fyans completed a Psychiatric Review Technique and a Mental RFC assessment of Plaintiff. (Tr. 985-98, 1007-09). In the Psychiatric Review, Dr. Fyans found that Plaintiff exhibited signs of anxiety and post-traumatic stress disorder, but that her mental status examination was within normal limits. (Tr. 990). She noted Plaintiff's past diagnosis of depression, but also a Dr. Jacobs' September 2009 Mental Status Exam showing no apparent depression. (Tr. 997). She also found that Plaintiff had a personality disorder. (Tr. 992). Dr. Fyans also evaluated Plaintiff under the "paragraph B" criteria of Listings 12.02-12.04, 12.06-12.08, and 12.10, finding that Plaintiff had mild limitations in activities of daily living and maintaining concentration, persistence, and pace, and moderate difficulties in maintaining social functioning. (Tr. 995). Reviewing's Plaintiff's self-reported activities of daily living, she found that Plaintiff's allegations were "mostly credible." (Tr. 997). In the Mental RFC assessment, Dr. Fyans concluded that Plaintiff was only moderately limited in her ability to understand and remember detailed instructions and to carry out detailed instructions; Plaintiff had no other significant limitations. (Tr. 1007-08). Dr. Fyans specifically considered Plaintiff's complaints of anxiety disorder, but found that she was functioning adequately, and was within normal limits. (Tr. 1009). In this assessment, Dr. Fyans determined that Plaintiff was only "partially credible." (Tr. 1009). She found that Plaintiff was affected by histrionic and borderline personality disorder, and thus should be limited to a socially restricted setting with a moderate level of social expectations. (Tr. 1009).

On October 27, 2009, Plaintiff again saw Dr. Agarwal for a checkup, complaining of increased joint pain. (Tr. 1033). Dr. Agarwal reported that at every appointment, Plaintiff complained that he did not write enough in her records for her to get disability benefits. (Tr. 1033). Plaintiff went to the emergency department in November 2009 with "moderate, but tolerable" lower back pain; a CT scan was ordered and she was discharged with medication later that night. (Tr. 1041-42, 1181-87). Plaintiff reported to the emergency department in December 2009 with a cough and abdominal pain, and was discharged later that same day. (Tr. 1167-73). Dr. Agarwal saw Plaintiff in April 2010 for back pain and bilateral hip pain, which he treated with medication. (Tr. 1229).

In May of 2010, a state agency physician, Dr. Sandra Bilinsky, and a psychiatric consultant, Dr. Joseph Mehr, reviewed Plaintiff's October 2009 RFC assessments in light of Plaintiff's complaints of worsening arthritis. (Tr. 1210-12). Reviewing additional medical records, these consultants affirmed the October 2009 finding that Plaintiff was capable of unskilled light work. (Tr. 1212).

Due to shoulder pain, Plaintiff had an x-ray on June 8, 2010, which showed no bone or joint abnormality. (Tr. 1238). On June 18, 2010, Plaintiff again saw Dr. Agarwal, complaining of left arm pain, bilateral knee pain, and depression. (Tr. 1227). As for Plaintiff's bilateral knee pain, Dr. Agarwal recommended that Plaintiff continue with her current medication and physical therapy, and that she lose weight. He also offered injections, but she refused. (Tr. 1227). Plaintiff reported that she could not afford her depression medication, so Dr. Agarwal changed her prescription to a different drug and offered counseling. (Tr. 1227). In July 2010,

Plaintiff went back to Dr. Agarwal with neck pain and upper back pain; he reported that she had generalized arthritis but had declined to pursue treatment at the pain clinic or injections. (Tr. 1226). At that appointment, Dr. Agarwal ordered an x-ray of Plaintiff's thoracic spine, which showed mild degenerative changes. (Tr. 1226, 1234). She also had an electrophysiological study that month, which showed no evidence of carpal tunnel, cubital tunnel, or cervical radiculopathy. (Tr. 1235).

On August 3, 2010, Plaintiff saw Dr. Agarwal; she was "really upset that back x-ray only showed mild arthritic changes," and asked him to order an MRI. (Tr. 1225). Dr. Agarwal advised continuing her current medications and exercises, and to try to lose weight. (Tr. 1225). Plaintiff's depression had also increased, aggravated by her son being shot. (Tr. 1225). Plaintiff also reported that her counselor was not very helpful, and wanted another counselor. Plaintiff saw Dr. Agarwal on September 2, 2010, complaining of upper back pain. (Tr. 1224). Dr. Agarwal noted that her x-rays showed mild arthritic changes, and referred her to a spine specialist at her request. (Tr. 1224). She also had an MRI of her cervical spine in September 2010, which showed mild disc dislocation and degenerative changes. (Tr. 1233).

In October 2010, Plaintiff complained to Dr. Agarwal of residual neck pain from the earlier motor vehicle accident, so he referred her again to physical therapy. (Tr. 1223). Plaintiff began physical therapy on October 25, 2010. (Tr. 350-91, 1245-84). On December 7, 2010, the physical therapist noted that Plaintiff's mobility had improved, but that her perception of pain had not changed. (Tr. 373). On January 18, 2011, Plaintiff reported that she was "ready to be done [with] therapy" because

she was having transportation problems. (Tr. 387). Plaintiff was discharged from physical therapy on February 26, 2011, after cancelling all of her appointments. (Tr. 353).

Plaintiff went back to Dr. Agarwal on January 5, 2011, with increasing neck pain. (Tr. 1221). She did not believe her physical therapy was helping. Dr. Agarwal opined that her neck pain was caused by degenerative disc disease. He noted that Plaintiff was "very scared of interventional procedures" and avoids injection treatments, and was also hesitant to seek help from the pain clinic. (Tr. 1221). Dr. Agarwal again offered injection treatments, but Plaintiff refused; he also advised her to lose weight. (Tr. 1220).

Plaintiff went to the emergency department in March 2011 with a sore throat, and was prescribed medication before her discharge the same day. (Tr. 1286-89). While at the hospital, Plaintiff had an x-ray, which showed mild degenerative changes in her thoracic spine and mild interstitial scarring. (Tr. 1295). Plaintiff saw Dr. Agarwal on March 22, 2011 with fatigue and chronic pain syndrome. (Tr. 1220). Dr. Agarwal noted Plaintiff's past history of anemia and hypothyroidism, as well as her compliance with the medications for those; he ordered blood tests and encouraged Plaintiff to lose weight. (Tr. 1220).

## III.   Hearing Testimony

ALJ Robert Schwartz held a hearing on Plaintiff's claim on May 4, 2011, at which Plaintiff was represented by her current attorney. (Tr. 39-87). After Plaintiff's attorney explained that she had amended her alleged onset of disability date to May 30, 2009 because she disagreed with the denial of her previous claim for

benefits, Plaintiff began her testimony. Plaintiff testified that she was born in 1966, was five feet, one inch tall, and 250 pounds. Plaintiff's weight had increased over the past two years, which she attributed to depression leading her to eat more. Plaintiff testified that she lived alone and did not drive often, primarily to the store; she later testified that she did not have a car. Plaintiff had completed high school and some college in the early 1990s. Plaintiff testified that she had last worked in 2009 as a bus monitor for the school district. She was asked to leave that job because she had asthma and anxiety attacks around the schoolchildren.

Plaintiff testified that her arthritis was the physical problem that bothered her the most. She testified that her back, knees, and hips were the most painful areas, giving her constant pain. Her doctor had advised that she go to a pain clinic, but she was unable to do so because she did not have a medical card, so her doctor prescribed medication for the pain. The medication was effective, but "not 100 percent." Plaintiff believed that the medication gave her side effects such as forgetfulness, mood swings, and loss of sex drive.

Plaintiff usually saw Dr. Agarwal once or twice in three months. Plaintiff was not in physical therapy at the time of the hearing. She testified that she did not continue with the physical therapy because it "starts tiring [her] out" and she doesn't feel it's effective. She said that Dr. Agarwal had told her that "sometimes too much physical therapy can hurt you." Plaintiff explained that she was "scared" of having a steroid or trigger point injection because Dr. Agarwal had explained that it was not guaranteed to be effective. Plaintiff also reported having headaches about three times a week, but that she had not told her doctor of them because she was

"tired of going to the doctor all the time." Plaintiff's asthma symptoms are triggered by pollen, choking, laughing, or physical exertion. Plaintiff reported taking an iron supplement for her anemia.

Plaintiff had only had one hospital admission due to her depression, in July 2009. She was dependent on her anti-depression medication. When she ran out of it and did not take it, she felt that she did not care about anything, and wanted to hurt people. Plaintiff reported that she feels calm when she is at home, but doesn't like to be around people.

The ALJ next turned to Plaintiff's physical abilities. Plaintiff reported that she regularly walked to and from her car, about 15 feet away, five times in a row. After completing that, she felt tired, her hips bothered her, and she laid down and took her pain medication. She also said that her legs and hips bother her if she stands for more than 20 minutes. If she sat for a prolonged period, her back, legs, and neck started to bother her. Plaintiff believed that she would have difficulty lifting five to ten pounds. She did not attempt to reach overhead or to the side because it caused pain in her shoulders. Plaintiff also did not attempt to climb stairs as a result of pain in her knees and legs. Plaintiff stated that Dr. Agarwal had prescribed her a cane to assist with her balance and prevent falls.

Plaintiff stated that she was capable of concentrating. The ALJ asked Plaintiff about her dislike of socializing. Plaintiff said that she doesn't like to be around people "because they ain't right." Plaintiff did attend church every other Sunday, but did not belong to any other organizations. She spent time reading her Bible. Plaintiff had difficulty dressing herself, and her daughter used to come to

help her put on and tie her shoes. Plaintiff used the microwave to cook, and did not do laundry or dishes. Her boyfriend and family members helped her with housework. Plaintiff's attorney elicited the testimony that Plaintiff tended to lean on a table for support when she sat, that she could not carry any weight when walking, and that she had been raped as a young teenager.

Charimain Terrell, Plaintiff's cousin, and Jeff McNeery, her boyfriend, testified. Ms. Terrell testified that Plaintiff's legs and ankles swell, she has difficulty walking, and she always has shoulder and arm pain. She stated that Plaintiff's medications cause her to be sleepy. Other than those problems, Ms. Terrell did not notice any difficulties for Plaintiff.

Mr. McNeery testified that he noticed Plaintiff to be depressed. He said that she slept all the time, and was in constant pain. If they go out, they have to hurry back home, and Plaintiff did not go out as much as she used to. He noted that her weight fluctuated up and down, and didn't know if perhaps her weight gain or stress contributed to her problems. He stated that she was "angry all the time," unlike when they first met in 2007, and that "everything" had changed since then. Mr. McNeery would go over to Plaintiff's home immediately after work, and would spend the night about four nights of the week in order to help her with daily tasks. Mr. McNeery and Ms. Terrell agreed that Plaintiff's asthma was worse depending on the weather and her stress level.

Mr. McNeery testified that he tried to help Plaintiff exercise, but she would be discouraged about it and quit after a few days. Ms. Terrell stated that she helped Plaintiff with all her household tasks. She testified that Plaintiff's legs and ankles

swell if she sits for two to three hours at a time, so she encourages Plaintiff to get up and walk around. Ms. Terrell had observed that Plaintiff walks with a limp and uses a cane, and could no longer wear high-heeled shoes. Plaintiff sometimes had to leave church early because she was uncomfortable.

The ALJ next turned to vocational expert Ronald Malik. After reviewing his qualifications and Plaintiff's past work, the ALJ asked him a series of hypothetical questions. Considering a person of Plaintiff's age, education, and work experience, who was able to lift, carry, push, and/or pull up to 20 pounds occasionally and up to 10 pounds frequently; who should avoid ladders, ropes, or scaffolding; who can climb ramps and/or stairs, balance, stoop, kneel, crouch, and/or crawl only occasionally; who must avoid concentrated exposure to temperature extremes, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards; who can understand and remember simple instructions; who is moderately limited in her ability to understand, remember, and carry out detailed instructions; who has sufficient attention and concentration to perform simple routine and repetitive tasks on a sustained basis with only routine breaks; who is moderately limited in her ability to interact appropriately with the general public; who needs a setting with reduced interpersonal contact with no more than occasional contact with supervisors, coworkers, and the general public; and who is moderately limited in her ability to respond appropriately to changes in the work setting, so any work should be limited to only ordinary and routine changes in work setting and duty. The vocational expert testified that such a person could not perform any of Plaintiff's past work.

Such an individual could perform the jobs of labeler, small product assembler, and marker.

Assuming the same limitations as given above, but with the additional limitations of sedentary work, meaning lifting no more than 10 pounds occasionally and standing or walking for no more than a total of two hours during a typical eight hour work day, the vocational expert testified that the hypothetical individual could work as a table worker, screen repairer, and finisher. If the individual were no more than 80 percent productive, or would miss more than three

days of work each month, she could not hold any job. Upon questioning by Plaintiff's attorney, the vocational expert testified that it would eliminate all of the jobs to miss two days of work per month, as well. After some argument from Plaintiff's attorney, the ALJ concluded the hearing.

## IV.   ALJ's Decision

The ALJ issued his decision denying Plaintiff's claim for benefits on May 27, 2011. (Tr. 20-33). After reviewing the procedural history of Plaintiff's claim and the applicable law, the ALJ determined that Plaintiff had the severe impairments of asthma, osteoarthritis of the back and neck, osteoarthritis of the extremities and major joints, obstructive sleep apnea, obesity, depression, post-traumatic stress disorder, and personality disorder. He found that Plaintiff's high blood pressure, urinary urgency symptoms, uterine fibroids, headaches, and sickle cell trait were not severe impairments, because none of them caused a more than minimal limitation to her ability to work.

Turning to the Listings of disabling conditions, the ALJ considered Listings 1.04, 1.02, 3.03, 3.10, 12.04, 12.06, and 12.08, and determined that none of them were satisfied. He noted that he also considered the effect of Plaintiff's obesity as part of this analysis.

Having determined that none of Plaintiff's impairments met or equaled the requirements of a Listing, the ALJ went on to assess Plaintiff's RFC. He determined that Plaintiff could lift, carry, push, and/or pull up to 20 pounds occasional and up to 10 pounds frequently. She could never climb ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and/or crawl. Plaintiff would have to avoid concentrated exposure to temperature extremes, humidity, fumes, odors, dusts, gases, and poor ventilation, as well as hazards such as unprotected heights and dangerous machinery. Plaintiff could understand and remember simple instructions, and was moderately limited in her ability to understand, remember, and carry out detailed instructions, but had sufficient attention and concentration to perform simple, routine, and repetitive tasks on a sustained basis with only routine breaks. She was moderately limited in her ability to interact appropriately with the general public, and would do best in a setting with reduced interpersonal contact, and so was limited to no more than occasional contact with coworkers, supervisors, and the general public. Plaintiff had a moderate limitation in her ability to respond appropriately to changes in the work setting, and so her work could not involve more than ordinary and routine changes in work setting or duties.

In assessing Plaintiff's RFC, the ALJ concluded that her medically determinable impairments could be expected to cause many of her alleged symptoms, but that her statements concerning the intensity, persistence, and limiting effects of these symptoms were not fully credible. He noted that there was very little objective evidence of Plaintiff's arthritis symptoms from imaging and other tests. He reviewed the results of Plaintiff's June 2009 consultative examination, and resulting physical RFC assessment, and found them probative, except that they did not mention Plaintiff's arthritis diagnosis. He also considered Plaintiff's allegations of disabling back, neck, and knee pain during her first application for benefits alongside physical examinations in 2007 showing normal results; this inconsistency cast doubt on Plaintiff's credibility. While the ALJ considered the effect of Plaintiff's obesity, but also noted that no treating or examining medical source had found that Plaintiff's obesity caused or contributed to any limitations.

Turning to Plaintiff's mental abilities, the ALJ discussed a 2006 consultative psychological examination prepared by Dr. Velez in support of her previous application for benefits, but discounted it because this GAF was based primarily on Plaintiff's subjective complaints at the time of the assessment, and did not show whether her condition had changed over time, and because Dr. Velez's objective observations did not reflect the same level of impairment suggested by the GAF. The ALJ observed that Plaintiff had rarely sought treatment for mental health problems, and had been hospitalized on that basis only once, in July 2009. He reviewed the September 2009 consultative psychological examination by Dr. Jacobs,

as well as the mental RFC assessment prepared by Dr. Fyans in October 2009. He accepted the mental RFC except insofar as it found only a mild difficulty with concentration, persistence, and pace; his assessment of Plaintiff's performance with Drs. Velez and Jacobs led to the conclusion that Plaintiff had moderate difficulties in that area. Finally, he considered Plaintiff's consistent improvement in her mental impairments with medication.

In assessing Plaintiff's overall credibility, the ALJ considered her boyfriend's and cousin's testimony that Plaintiff had declined dramatically since 2007 in light of Plaintiff's previous claim of disability beginning in 2005. He found this testimony to be inconsistent with Plaintiff's previous allegation of disability. He also noted that Plaintiff had failed to pursue treatments repeatedly suggested by her doctor, and that her doctors had advised her to lose weight and exercise. Medication had also improved Plaintiff's back and knee pain at certain times. Moreover, though she had shown the ability to work in the past, Plaintiff had a sporadic employment record with relatively low earnings. Finally, the ALJ noted other evidence he believed cast doubt on Plaintiff's credibility: her complaint to her doctor that he did not write enough in her records to support a disability claim, and the observation by the consultative physician during her September 2009 mental examination that she seemed to exaggerate her symptoms. Considering all of this, the ALJ concluded that Plaintiff was not fully credible to the extent inconsistent with the RFC he found.

Finding that Plaintiff was unable to perform her past relevant work, the ALJ relied on the vocational expert's testimony that a person of Plaintiff's RFC would be able to perform the jobs of labeler, small product assembler, and marker. If Plaintiff

21

were limited to sedentary work, but otherwise the same RFC, she would be able to perform the job of table worker, screen repairer, and finisher. Because a sufficient number of these jobs exists, the ALJ found that Plaintiff was not disabled.

DISCUSSION

Plaintiff attacks the ALJ's decision on five fronts: (1) whether he adequately considered the combined effect of Plaintiff's impairments, especially her obesity; (2) whether he adequately supported his RFC assessment; (3) whether he adequately considered Plaintiff's allegations of pain; (4) whether he properly handled the record in this case; and (5) whether he properly assessed Plaintiff's credibility.

## I.   Did the ALJ adequately consider the combined effect of Plaintiff's impairments, especially her obesity?

Plaintiff lists a number of conditions that she argues that ALJ failed to adequately consider in combination with her obesity: sickle cell trait,[7] thyroid problem, a knee problem, asthma, sleep apnea, and fatigue.[8] (Doc. 15 at 14). In his

---

[7]   Plaintiff misstates the correct name of her sickle-cell-related condition, calling it "sickle cell anemia." (Doc. 15 at 13-14). As explained above, Plaintiff has "sickle cell trait," which simply means that she carries the sickle cell gene, but does not have the disease of sickle cell anemia; Plaintiff has never been diagnosed with the serious condition of sickle cell anemia, and no medical evidence indicates that she is one of the few people who suffers any symptoms from sickle cell trait. There is some evidence that Plaintiff has occasionally been diagnosed with anemia, but this term, by itself, merely indicates "a reduction below normal in the concentration of erythrocytes or hemoglobin in the blood." "Anemia," DORLAND'S MEDICAL DICTIONARY, http://dorlands.com (last visited November 20, 2013). The Court hopes that Plaintiff's counsel did not intend to mislead the Court by this error.

[8]   Plaintiff mentions "fatigue" and "chronic fatigue." "Chronic fatigue syndrome" is a particular, diagnosable, condition: "persistent debilitating fatigue lasting longer than six months, with other known medical conditions having been ruled out by clinical diagnosis, accompanied by at least four of the following: significantly impaired short-term memory or concentration, muscle weakness, pain in multiple joints without swelling or redness, sore throat, tender lymph nodes, headaches,

opinion, the ALJ found that Plaintiff's severe impairments included osteoarthritis of the extremities and major joints, asthma, obstructive sleep apnea, and obesity. He found that Plaintiff's sickle cell trait was not a severe impairment because it did not cause a more than minimal limitation to her ability to work. The ALJ stated that he considered Plaintiff's obesity in combination with her other severe impairments, as required by S.S.R. 02-1p.

First, the Court must point out that no medical evidence has linked Plaintiff's sickle cell trait to any symptoms. Sickle cell trait, as mentioned above, means only that a person carries the sickle cell gene, and does not itself indicate any resulting symptoms. Simply having this gene does not constitute medical evidence of any disabling symptoms, and the Court cannot indulge Plaintiff's speculation that it *might* cause certain symptoms. Similarly, the medical evidence shows, on different occasions, an elevated thyroid level and a below-normal thyroid level, but no medical evidence links those discrepancies to any particular symptoms. (Tr. 459-60, 1220). While Dr. Agarwal did order blood tests to check Plaintiff's thyroid levels in March 2011 following her complaints of fatigue, he did not conclusively attribute the fatigue to a thyroid problem, instead recommending that Plaintiff lose weight. (Tr. 1220).

---

unrefreshing sleep, and malaise that lasts more than 24 hours following exertion. The cause is unknown and may be multifactorial; immune dysfunction has been suggested, and viral infection may be associated with it, although no causal relationship has been demonstrated." "Chronic Fatigue Syndrome," DORLAND'S MEDICAL DICTIONARY, http://dorlands.com (last visited November 20, 2013). Plaintiff points to no medical evidence of any actual diagnosis of chronic fatigue syndrome, so the Court will assume that she means to refer simply to fatigue.

Plaintiff's sickle cell trait, knee problem, asthma, anemia, and sleep apnea were considered by Dr. Gonzalez, who was also aware of her obesity, and who yet found her not to be disabled. Where a consultative physician who is aware of the relevant conditions opines that a claimant is able to work, the ALJ may rely on that opinion to find the claimant not disabled. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). Moreover, in addition to adopting the limitations imposed by Dr. Gonzalez, the ALJ himself noted that Plaintiff's obesity could be expected to exacerbate the effects of her arthritis in her knee, that it may impose a greater burden on the heart and lungs, and that it may impair a person's ability to sustain activity throughout the work day and work week.

The Court finds no error in the ALJ's consideration of these conditions in combination with one another and with Plaintiff's obesity.

## II.   Did the ALJ adequately support his RFC assessment?

Next, Plaintiff argues that the ALJ erred in making his RFC assessment because he failed to consider (a) Plaintiff's use of a cane, (b) Plaintiff's limited ability to remain on task, (c) her limited ability to use both her arms and hands, (d) her pain, (e) her fatigue, (f) wheezing, (g) depression and anxiety, and (h) her expected absences from work. None of these considerations justifies overturning the ALJ's RFC assessment.

As pointed out by Defendant, the ALJ's RFC assessment is based on the conclusions of state agency physicians and psychologists, all of whom found Plaintiff to be capable of working at the light exertional level with certain limitations. The ALJ's RFC assessment is in line with the assessments made by these experts, and

he was entitled to rely on them as substantial evidence of Plaintiff's condition. 20 C.F.R. § 404.1527(e)(2)(i); S.S.R. 96-6p. Most of the points made by Plaintiff were explicitly considered by the state agency physicians and psychologists when they made their assessments. Dr. Gonzalez noted that Plaintiff used a cane, and considered her asthma, obesity, pain, and limited range of motion, but still concluded that Plaintiff was physically capable of working at the light exertional level with appropriate limitations. Similarly, Dr. Fyans considered Plaintiff's complaints of anxiety and depression, but found that she was functional and within normal limits, and that Plaintiff had only mild limitations maintaining concentration, persistence, and pace. These doctors considered five of the issues Plaintiff now complains were ignored, and their assessments reflect the actual work limitations imposed by Plaintiff's use of a cane, her ability to remain on task, her ability to use her arms and hands, her pain, her wheezing due to asthma, and her depression and anxiety. Their opinions that these problems do not prevent Plaintiff from working are substantial evidence that supports the ALJ's opinion.

In addition to being supported by substantial evidence from the state agency doctors, the ALJ accounted for these problems mentioned by Plaintiff in his RFC findings and his discussion with the vocational expert. If Plaintiff is truly required to use a cane at all times,[9] she is likely correct that she cannot perform most of the range of "light" work, as that entails carrying items while walking, but the

---

[9]     Plaintiff points to no evidence other than her own testimony that she was prescribed a cane by a physician, or that she must actually use one at all times. As mentioned above, Dr. Gonzalez noted that she did use one, but also found her capable of light work. Just a month before Dr. Gonzalez's review, though, Dr. Ausfahl indicated that Plaintiff did not need any assistive devices.

vocational expert testified that there were also a sufficient number of "sedentary" jobs available for a person of Plaintiff's abilities and limitations. With such testimony, the Court can be sure that a remand would still result in a finding that Plaintiff is not disabled, since there are sufficient jobs that she can do even if she uses a cane. *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) ("If it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time.")

Further, Plaintiff actually testified that she can concentrate, but the ALJ also addressed her concentration issues by limiting her to simple, routine, and repetitive tasks. He limited her to never climbing ladders, ropes, or scaffolds, which appears to be an accommodation of her limited ability to use her arms and hands, addressed her pain by limiting temperature extremes, and addressed her wheezing by limiting humidity, fumes, odors, dusts, gases, and poor ventilation. Finally, he accommodated Plaintiff's depression and anxiety, which she described as manifesting in a desire to avoid being around others, by limiting her exposure to others, and by limiting the requirements for concentration, fulfilling instructions, and tolerance for changes at work.

As for whether the ALJ should have considered Plaintiff's allegation of fatigue and whether he should have expected her to be absent from work an unacceptable number of days per month, Plaintiff points to no objective evidence of these problems. She identifies no treating or consultative physician's opinion of symptoms related to fatigue or that she was rendered unable to work because of it.

Similarly, there is no evidence from any source that Plaintiff would need to miss more than two days of work per month, which was the threshold of acceptability testified to by the vocational expert. Thus, any weight given to these allegations would rest solely on the credibility of Plaintiff's allegations, which is discussed further below.

The ALJ did not err in his consideration of Plaintiff's use of a cane, her limited ability to remain on task, her limited ability to use her arms and hands, her pain, her fatigue, wheezing, depression and anxiety, and her expected absences from work.

III.   **Did the ALJ adequately consider Plaintiff's degenerative disc disease and spina bifida occulta?**

As discussed in the medical history above, several imaging scans showed evidence of degenerative disc disease, and Plaintiff was diagnosed with spina bifida occulta in 2005. Plaintiff argues that the ALJ failed to adequately consider the symptoms likely caused by these problems.

Plaintiff's degenerative disc disease was noted in several imaging scans and by Dr. Agarwal. However, it was usually characterized as "mild," and Dr. Agarwal only once mentioned any symptoms arising from it, opining that it caused her neck pain. Further, Dr. Gonzalez's physical RFC was based on March and June 2009 MRI scans showing the mild degenerative changes, and yet she found Plaintiff to be capable of light work with certain limitations. In her brief, Plaintiff points to no evidence concerning the effects of her degenerative disc disease on her ability to work. A disability claimant must show that a particular medical problem actually affects her ability to work, not merely that the problem exists. *See Skinner v.*

*Astrue*, 478 F.3d 836, 845 (7th Cir. 2007) ("[T]he existence of these diagnoses and symptoms does not mean the ALJ was required to find that [Plaintiff] suffered disabling impairments.").

Plaintiff also points to the diagnosis of spina bifida occulta. As explained above, though some forms of the condition cause problems, "[spinal bifida occulta] is common; 10 to 20 percent of healthy people have it. Normally it is safe…." Spina Bifida Association, "Spina Bifida Occulta," http://www.spinabifidaassociation.org/ site/c.evKRI7OXIoJ8H/b.8277205 (last visited November 22, 2013). Again, Plaintiff points to no medical evidence that this condition has any effect on her ability to work. Plaintiff's counsel speculates, based on a letter from Plaintiff's mother indicating that Plaintiff wore corrective shoes as a child, that Plaintiff now suffers disabling effects from the condition:

> The letter shoes [*sic*] that claimant did have symptoms as a child, so we cannot say it is unlikely she would have problems as an adult. These problems *could include* weakness in the legs, leg length discrepancy, of which her use of inserts as a child is evidence, scoliosis, incontinence, and back pain.

(Doc. 15 at 15 (emphasis added)). Such speculation of possible symptoms, based on nothing more than the kind of shoes worn by Plaintiff as a child, would be inappropriate for an ALJ or this Court to indulge. The mere existence of a certain condition, especially one which is often benign, is not sufficient to find that the Plaintiff actually suffers disabling impairments as a result of the condition. *Skinner*, 478 F.3d at 845. The ALJ did not err in his consideration of this condition.

More broadly, but without much specific argumentative or evidentiary support, Plaintiff also argues that the ALJ failed to adequately consider her

allegations of pain. On the contrary, the ALJ acknowledged the existence of Plaintiff's pain and stated that her documented impairments could be expected to cause limitations, and fully considered her credibility on that issue in light of the evidence. The ALJ's consideration of Plaintiff's credibility, including her credibility on the issue of pain, is discussed further below.

The ALJ did not err in his consideration of Plaintiff's degenerative disc disease or spina bifida occulta.

## IV.    Did the ALJ misstate certain facts?

Next, Plaintiff lists several issues as to which she claims the ALJ "mischaracterized the record." (Doc. 15 at 16-17). The Court has reviewed each of these and finds no reversible error.[10]

### A. The reasons Plaintiff quit working

In his opinion, the ALJ noted that Plaintiff quit her job as a school bus monitor because of an asthma attack. Plaintiff now claims that the ALJ ignored her testimony as to why she quit working, as well as her statements to Dr. Jacobs and Dr. Kyle that she quit because of anxiety attacks and asthma. She does not explain the significance of this purported error other than to say that the "ALJ failed to consider evidence of record that supported disability." Because Plaintiff claims that *both* her asthma and anxiety contribute to her alleged disability, and because the ALJ did not hang any part of his analysis on whether it was an asthma attack or an anxiety that led to her quitting work, the Court cannot see how it makes any

---

[10]    Plaintiff also includes in this section complaints about the ALJ's consideration of failure to seek further mental health treatment and about his evaluation of her credibility, which the Court addresses under the next sub-heading.

difference to the outcome of the appeal whether the ALJ attributed Plaintiff's leaving work to asthma or anxiety, or both.

In any event, the ALJ's statement was not erroneous, as shown by Plaintiff's own testimony and statements to the Commissioner. At the hearing, Plaintiff testified that she "had a couple asthma attacks, anxiety attacks, and hyperventilated. And my back and everything started acting up and I started having problems with the children, having anxiety attacks around the kids. And they told me not to come back." (Tr. 46). At the previous hearing, as pointed out in her brief, Plaintiff stated that she "had an attack on the bus and I hyperventilated attack, an asthma attack and an anxiety attack." (Tr. 96). Plaintiff herself thus testified to an asthma attack, an anxiety attack, and hyperventilation. Moreover, in her written claim for disability, Plaintiff wrote "I had an asthma attack." (Tr. 240). The ALJ cannot be faulted for relying on Plaintiff's own statements as to why she quit working. As Plaintiff herself points out in her brief, saying that Plaintiff had an asthma attack "is consistent with losing that job as a result of an anxiety related disorder." (Doc. 15 at 16). More importantly, as explained above, it is impossible to see how the statement made any difference to the outcome of the ALJ's decision.

### B. Effects and status of Plaintiff's depression

The ALJ observed that Plaintiff had primarily sought treatment for her depression when faced with a significant stressful situation, and that her symptoms improved with medication. Plaintiff makes no argument beyond pointing out her one depression-related hospitalization and Mr. McNeery's testimony that Plaintiff's mood seemed to be returning to where it was at the time of the hospitalization.

The ALJ was not wrong in pointing out that Plaintiff has had only one depression-related hospitalization, in July 2009, which she attributed at the time to stresses at home, and that she had quit counseling and her medication some time before she was hospitalized. In addition, as noted above, Plaintiff testified that her medication controls her depression; she only reported depressive symptoms when she ran out of medication. As for Mr. McNeery's testimony relating to Plaintiff's depression, that she had been doing well in 2007 but was much worse at the time of the hearing, the ALJ found that it was inconsistent with Plaintiff's previous application for disability benefits, which alleged that she was disabled in 2006 and 2007.[11] There was no error in the ALJ's pointing out these facts.

**C. GAF score given by Dr. Velez**

Because Plaintiff's attorney argued for its consideration, the ALJ specifically noted the GAF score of 45 found by Dr. Velez in May 2006. (Tr. 1299). He correctly observed, however, that the GAF is based primarily on a patient's subjective descriptions and is only a measure of the patient's status at that moment in time; it is most useful when several GAF scores are taken over time and considered together. Plaintiff complains that the ALJ did not further consider Dr. Kyle's finding of a GAF score of 40 in July 2006. Both of these scores predate Plaintiff's current application for disability and current alleged onset date; indeed, Plaintiff was found not to be disabled for the period of time covering the two 2006 GAF scores. While they might be useful to show a pattern over time if compared to current GAF scores, simply comparing them to one another is unhelpful in

---

[11]   The ALJ's consideration of Mr. McNeery's testimony is addressed further below.

determining if Plaintiff has been disabled since May 2009. It was not error for the ALJ to disregard these old GAF scores, especially since he gave good reasons for doing so.

### D. Dr. Fyans' assessment of Plaintiff's credibility

Dr. Fyans opined that Plaintiff was "mostly credible," and also that she was "partially credible." (Tr. 997, 1009). Plaintiff faults the ALJ for failing to mention to the "mostly credible" description, and complains that he erred in failing to specifically state what weight he gave that statement. Whatever difference there is between being "mostly" and "partially" credible, the ALJ did not err in his consideration of Dr. Fyans' assessment of Plaintiff's credibility. Ultimately, a claimant's credibility is to be determined by the ALJ, based on a number of factors. Here, the ALJ found, as discussed further below, that Plaintiff was not completely credible, which is consistent with the terms "mostly" or "partially." Thus, even if the ALJ did give Dr. Fyans' assessment the fullest weight possible, there is no reason to suppose that his evaluation of Plaintiff's credibility would change as a result. Dr. Fyans herself found Plaintiff to be capable of working with certain restrictions, thus indicating her belief that Plaintiff's allegation of total disability was not completely believable; Plaintiff thus asks the ALJ to accept Dr. Fyans' assessment of her as "mostly credible" while rejecting Dr. Fyans' conclusion that she could work.

### E. Consideration of March 31, 2009 MRI

Plaintiff complains that the ALJ did not give sufficient weight to the findings of the March 31, 2009 MRI of Plaintiff's left knee, which she claims "show[ed] a significant progression from the changes identified in the prior study from 2003."

(Doc. 15 at 17). No matter the particular description the ALJ gave of the MRI results, Dr. Gonzalez specifically considered the March 31, 2009 MRI of Plaintiff's left knee in her review of Plaintiff's condition. Dr. Gonzalez's expert medical opinion was that the MRI did not show disabling changes to Plaintiff's knee, and the ALJ was entitled to rely on that opinion rather than his own guess as to the significance of the results.

## V.      Did the ALJ properly assess Plaintiff's credibility?

Finally, Plaintiff argues that the ALJ erred in his assessment of Plaintiff's credibility. As noted above, the Court will not disturb an ALJ's credibility findings "so long as they find some support in the record and are not patently wrong." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994). A credibility determination is only patently wrong if the ALJ's reasons for discrediting testimony are unreasonable or unsupported. *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010). Social Security Ruling 96-7p covers the ALJ's evaluation of a claimant's credibility, and instructs that the ALJ is to consider all the evidence in the record, and is specifically to consider the statements in light of their consistency with other evidence, the medical evidence and history, and other pieces of information, which may include the seven factors listed in 20 C.F.R. 404.1529(c),[12] which Plaintiff here cites.

---

[12]      These factors include:
         (i) Your daily activities;
         (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
         (iii) Precipitating and aggravating factors;
         (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

In assessing Plaintiff's RFC, the ALJ found that Plaintiff's claims concerning the intensity, persistence, and limiting effects of these symptoms were not fully credible, and gave a number of reasons: there was very little objective evidence of Plaintiff's arthritis symptoms from imaging and other tests; Plaintiff's allegations of disabling back, neck, and knee pain during her first application for benefits were inconsistent with an examination during that period showing normal results; Plaintiff had rarely sought treatment for her mental health problems; Plaintiff's mental impairments and her pain had improved with medication; Mr. McNeery's and Ms. Terrell's testimony of a sudden decline was inconsistent with Plaintiff's previous allegation of disability; Plaintiff had failed to pursue injection treatments repeatedly suggested by her doctor; Plaintiff's doctors had advised her to lose weight and exercise, to no avail; though she had previously been able to work, Plaintiff had a sporadic employment record with relatively low earnings; Plaintiff was overly focused on obtaining disability benefits when she met with Dr. Agarwal; and Dr. Jacobs had noted that Plaintiff seemed to exaggerate her symptoms. Plaintiff attacks several of these considerations as inappropriate or erroneous.

Before turning to Plaintiff's specific attacks on the ALJ's credibility reasoning, the Court considers Plaintiff's claim that the ALJ was insufficiently specific about which of her statements are not credible. This assertion is baseless.

---

(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms

20 C.F.R. 404.1529(c)(3).

The ALJ specifically stated that Plaintiff's "suggestion that she cannot perform any sustained work is not credible," and he reviewed, as listed above, each consideration that went into this conclusion. (Tr. 30).

## A. 2007 medical reports

The ALJ noted an April 2007 report from Plaintiff's visit to the emergency department for a sore throat, which showed normal results for the symptoms Plaintiff claimed were disabling in her first application for benefits, and found that this inconsistency cast doubt on her overall credibility. He also noted Plaintiff's full range of motion at an emergency department visit from September 2007, which report also included the notation that Plaintiff was able to walk without difficulty. Plaintiff complains that these reports did not arise from full physical examinations, and are inappropriate to consider because they pre-date the currently relevant period. The Court finds no error in their consideration solely for purposes of a credibility determination. The ALJ did not use the 2007 reports themselves to find that Plaintiff was not currently disabled, but to inform his evaluation of her honesty. The fact that Plaintiff claimed to be disabled by certain impairments during 2007 while medical reports from the period indicated no significant problems with those impairments is an indication of Plaintiff's overall credibility, or her willingness to exaggerate her symptoms for the purpose of receiving benefits.

## B. Dr. Jacobs' statement that Plaintiff exaggerated her symptoms

The ALJ further considered Dr. Jacobs' note that Plaintiff's description of her post-traumatic stress disorder symptoms was vague, that she exaggerated mildly, and that she had histrionic tendencies. Plaintiff claims that "it is impossible to

know the basis of these comments" by Dr. Jacobs.[13] (Doc. 15 at 19). On the contrary, these are among Dr. Jacobs' expert conclusions, based on his psychological examination of Plaintiff. If anyone could make these observations about a patient, it would be a psychologist who personally examines the patient, and there is no error in the ALJ relying on them.

### C. Mr. McNeery's and Ms. Terrell's testimony

The ALJ discredited Mr. McNeery's testimony that Plaintiff had deteriorated severely since 2007 because it was inconsistent with Plaintiff's allegation of disability at that time in her earlier claim for benefits; Ms. Terrell had concurred with Mr. McNeery, so her testimony was suspect, as well. Plaintiff complains that this is an inappropriate basis on which to discredit Mr. McNeery and Ms. Terrell, because they merely testified to her decline since 2007, and did not explicitly state that she was not disabled in 2007. Because he hears it in person and in context, the ALJ is the person in the best position to gauge the credibility of hearing testimony, and to understand the implication of a witness' testimony. Upon reviewing the transcript of Mr. McNeery's and Ms. Terrell's testimony, the Court cannot say that it was unreasonable for the ALJ to interpret their statements as implying that Plaintiff was not disabled in 2007. With that understanding of the testimony, it was rational for the ALJ to partially discredit their testimony on that basis.

---

[13] Plaintiff also complains that Dr. Jacobs failed to mention a history of self-harm that was reported on July 7, 2009 (Doc. 15 at 20 (citing Tr. 670)). The Court has reviewed the cited page, and the only reference to self-harm is Plaintiff's statement that she would, if she were to attempt suicide, use glass to cut her wrist. (Tr. 670). There is no indication that she had any history of actually attempting to harm herself.

### D. Failure to pursue treatments

Plaintiff also complains that the ALJ considered her failure to pursue treatment without considering her reasons for that failure. She claims that he should have considered that she did not seek additional mental health treatment because she could not afford it, and did not consider injection treatments for her knee pain because she was afraid of "interventional procedures." An ALJ should consider a claimant's reasons for refusing a recommended treatment before using that refusal to undermine the claimant's credibility under 20 C.F.R. 404.1529(c)(3)(v). S.S.R. 96-7p; *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) (citing S.S.R. 96-7p; *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008)). "Good reasons" for failing to pursue treatment include a lack of effective treatments, inability to afford treatments, or intolerable side effects. S.S.R. 96-7p. It appears that the ALJ did not seek or consider Plaintiff's reasons for failing to pursue these treatments. However, so long as the ALJ has other valid reasons for questioning the claimant's credibility, the failure to consider "good reasons" for failure to pursue treatment does not fatally undermine the credibility analysis. *McKinzey v. Astrue*, 641 F.3d 884, 890-91 (7th Cir. 2011). As discussed throughout this section, the ALJ had ample reasons for discounting Plaintiff's credibility, and so the Court cannot reverse solely because of this omission.[14]

---

[14]     The Court doubts that, even if he had sought and considered these answers, the ALJ's consideration of Plaintiff's reasons for refusing further treatment would make any difference to the outcome. As for her mental health treatment, her decision to stop counseling seems to have been based on her dislike of her counselor, not an inability to afford it. Plaintiff herself told Dr. Kyle that she quit going to

### E. History of low earnings

The ALJ stated that he could not "infer that the claimant stopped working solely due to her impairments" because, even before the alleged onset date of her disability she had a history of sporadic and low earnings. Plaintiff takes issue with this observation, noting that during much of the period the ALJ considered, she was raising four children as a single mother. While Plaintiff's argument about the effect of parenting on a single mother's ability to work may be valid, it was also not an unreasonable conclusion for the ALJ to draw that Plaintiff simply wishes to avoid work and could have worked more consistently in spite of her parenting obligations. Many single mothers do manage to work consistently while raising children, though it is difficult. The Court cannot find error with an ALJ's conclusion merely because the opposite conclusion is also reasonable; the ALJ's findings may only be disturbed if they are unreasonable.

### F. Plaintiff's focus on receiving benefits

In October 2009, Plaintiff complained to Dr. Agarwal that he did not write enough in her records for her to get disability benefits. The ALJ took note of this, finding that it showed Plaintiff's focus on obtaining benefits and undermined her

---

counseling because the counselor could not fix her problems for her. She later told Dr. Agarwal that she did not like her counselor, and requested a different one. On only one occasion did Plaintiff indicate that she could not afford a treatment related to her mental health: in June 2010, she told Dr. Agarwal that she could not afford her depression medication, so he changed the prescription to a different drug and offered counseling. Plaintiff's self-reported reason for quitting counseling was that she did not believe it to be effective and she did not like her first counselor; her inability to afford the medication was apparently addressed by Dr. Agarwal, and she was taking antidepressants at the time of the hearing. Moreover, Plaintiff cites no authority for the proposition that fear of a recommended treatment is a "good reason" for refusing it, and the Court has found none.

credibility. Plaintiff argues that she was merely "repeating what she had been told," and that doctors' failure to thoroughly record all symptoms is a common cause for the denial of benefits. (Doc. 15 at 20). Plaintiff's argument only reinforces the ALJ's conclusion, lending credence to the idea that she was focused on getting disability benefits and "repeated" to Dr. Agarwal what her attorney or another advisor had told her would increase her chances of getting benefits. It was quite reasonable for the ALJ to find that this behavior showed an increased likelihood that Plaintiff was exaggerating her allegations in order to obtain benefits.

Plaintiff's attacks on the ALJ's credibility determination do not show that it was "patently wrong."

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Doc. 14) is DENIED and Defendant's Motion for Summary Affirmance (Doc. 19) is GRANTED. CASE TERMINATED.

Entered this <u>26th</u> day of November, 2013.

s/ Joe B. McDade
JOE BILLY McDADE
United States Senior District Judge
